**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

ANTON THURMAN MCALLISTER,    )
                                    )
            Plaintiff,      )
                                    )
            v.              )         1:19cv1034
                                    )
WELLPATH HEALTH CARE, et al.,    )
                                    )
            Defendants.     )

<u>**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**</u>

    This case comes before the undersigned United States Magistrate Judge for a recommendation on two motions for summary judgment (Docket Entries 101 (the "Medical Defendants' Motion"), 106 (the "Law Enforcement Defendants' Motion")). For the reasons that follow, the Court should grant both motions.

<u>**BACKGROUND**</u>

<u>**I. Procedural History**</u>

<u>**A. Screening and Partial Dismissal**</u>

    Pursuant to 42 U.S.C. § 1983 ("Section 1983"), Anton Thurman McAllister (the "Plaintiff"), acting pro se, commenced this action against Wellpath Health Care, Eli Lilly and Company, Dr. Cunningham, Dr. Bosholm,[1] Mrs. Williams, Rocky Joyner, Major R.E.

---

    1 Although Plaintiff identified this individual as "Dr. Basholm" (Docket Entry 2 at 2), subsequent filings revealed the correct spelling of her name (<u>see, e.g.,</u> Docket Entry 67 at 1).

Slater,[2] Captain C. Warren, Forsyth County Sheriff's Department, and Forsyth County Council, alleging acts and/or omissions amounting to deliberate indifference to Plaintiff's serious medical needs during his pretrial detention at the Forsyth County Sheriff's Office Law Enforcement Detention Center (the "Detention Center"). (See Docket Entry 2 (the "Original Complaint") at 1–21.)[3] Plaintiff also asserted claims for medical malpractice (see id. at 18) and "[u]nlawful professional [j]udgement [sic]" (id. at 21). Plaintiff subsequently amended the Original Complaint as of right, naming as additional defendants HIG Capital Equity Firm, Dr. Alan Rhoades ("Regional Doctor" for Wellpath), and Bobby Kimbrough (the Forsyth County Sheriff). (See Docket Entry 3 (the "First Amended Complaint") at 2.)

A few months later, Plaintiff tendered a 70-page (caption-less) document (see Docket Entry 4 (the "Supplement")), consisting of (i) a two-page cover letter (see id. at 2–3), (ii) an annotated excerpt of the Original Complaint (see id. at 4–8), (iii) an annotated selection of Plaintiff's medical records (see id. at 9–10), (iv) annotated excerpts from abstracts and articles (see id. at 11–15) that Plaintiff characterized as "informational researched

---

2 Although Plaintiff initially identified this individual as Major "B. Slater" (Docket Entry 2 at 5), he later clarified that he had misnamed Major R.E. Slater (see Docket Entry 3 at 9).

3 Citations herein to Docket Entry pages utilize the CM/ECF footer's pagination.

documents" (id. at 2), and (v) copies of grievances, grievance responses, and responses to sick calls that Plaintiff had submitted at the Detention Center (see id. at 17-70). Via the cover letter, Plaintiff disclaimed any intention "to present an amended complaint" (id. at 3), explaining that he only wished to provide "this bit of information . . . to whomever is doing the screening" (id.). The Court (per the undersigned) struck the Supplement because Plaintiff had neither "shown written consent to amend [the First Amended Complaint]" nor "properly sought leave of th[e] Court to do so." (Text Order dated May 6, 2020.)

Thereafter, upon screening pursuant to 28 U.S.C. § 1915A(a), the undersigned recommended that the Court dismiss many of the claims in the Original Complaint and the First Amended Complaint for failure to state a claim (see Docket Entry 5 (the "Recommendation") at 2) but allow to proceed "the claims based on allegations of deliberate indifference related to Plaintiff's medical treatment by Defendants Bosholm, Williams, and Rhoades [(collectively, the 'Medical Defendants')]" (id. at 18; see also id. at 11-12 (summarizing allegations in Original Complaint as to Defendants Bosholm and Williams as well as allegations in First Amended Complaint as to Defendant Rhoades)). The undersigned recommended dismissal of all other claims because (i) Plaintiff had failed to comply with a pleading requirement for a North Carolina medical-malpractice claim (see id. at 5-7, 11-12, 16);

3

(ii) allegations of medical malpractice fail to state a claim under Section 1983 (see id. at 5, 10–12, 16); (iii) conclusory allegations of deliberate indifference or constitutionally deficient policies or customs fail to state a claim under Section 1983 (see id. at 7–8, 13–14, 16–17); (iv) Plaintiff possessed no constitutional right to a grievance procedure or response (see id. at 8, 11–13) or to doctors of his own choosing (see id. at 14); (v) "jail officials are entitled to rely on medical professionals to handle medical treatment" (id. at 13; accord id. at 14, 17); (vi) Defendant Eli Lilly does not qualify as a state actor under Section 1983 (see id. at 9); (vii) a products-liability claim against Defendant Eli Lilly "would not share common questions of law and fact with the claims raised against other defendants" (id.); (viii) assuming Plaintiff "intend[ed] to name [as a defendant] the Forsyth County Board of Commissioners" (id. at 15) (instead of the Forsyth County Council, a nonexistent entity (see id. at 14–15)), "a county board of commissioners in North Carolina is not a legal entity capable of being sued" (id. at 15); and (ix) "theories of *respondeat superior* or liability predicated solely on a defendant's identity as a supervisor do not exist under [Section] 1983" (id. at 16; accord id. at 17).

Plaintiff objected in part to the Recommendation, agreeing to dismiss his medical-malpractice claim as well as all claims against Defendants Eli Lilly and Warren, but maintaining that all other

claims should proceed.  (See Docket Entry 7 at 4.)  Shortly
thereafter, Plaintiff again moved to amend, tendering a (caption-
less) document in which he (i) reasserted his claims for deliberate
indifference (see Docket Entry 8 (the "Second Amended Complaint")
at 3-5) and "[u]nlawful [p]rofessional [j]udgment" (id. at 7)
against certain defendants (see id. at 8-24); (ii) supplemented the
First Amended Complaint to include allegations about how the
Detention Center handled the COVID-19 pandemic (see id. at 6, 7;
see also id. at 11, 15-24 (including such supplemental allegations
as to Wellpath Health Care, Rocky Joyner, R.E. Slater, Forsyth
County Sheriff's Department, HIG Capital Equity Firm, and Bobby
Kimbrough)); and (iii) named Gloria Whisenhunt as a defendant (see
id. at 25-29).[4]

    The Court (per United States District Judge Catherine C.
Eagles) ultimately adopted the Recommendation, "agree[ing] that all
claims asserted in the First Amended Complaint except the
deliberate[-]indifference claims against [the Medical Defendants]
should be dismissed."  (Docket Entry 9 at 3.)  As concerns
Plaintiff's attempt to supplement his allegations as to certain
dismissed defendants and to add Gloria Whisenhunt as a defendant,

_____

    4 The Court (per United States District Judge Catherine C.
Eagles) viewed the Second Amended Complaint as more of a supplement
than an amendment, because "it d[id] not address at all
[Plaintiff's] claims against [the Medical Defendants] and []
raise[d] new claims based on events after the date the [F]irst
[A]mended [C]omplaint was filed."  (Docket Entry 9 at 3.)

the Court rejected those efforts as futile. (See id. at 4.)[5] However, the Court granted the motion to amend insofar as Plaintiff sought leave "to add the COVID-19 related [Section] 1983 claims against [Defendants Joyner, Slater, Kimbrough, and Forsyth County Sheriff's Office (collectively, the 'Law Enforcement Defendants' and together with the Medical Defendants, 'Defendants')]" (id. at 5).[6] Accordingly, the following claims survived screening:

(1) "claims based on allegations of deliberate indifference related to [ P]laintiff's medical treatment by [the Medical D]efendants" (id. (the "Medical Treatment Claims")), and

(2) "Section 1983 claims based on deliberate indifference arising out of the COVID-19 pandemic . . . against [the Law Enforcement D]efendants" (id. (the "COVID-19 Claims")).

**B. Answers and Amendment**

Defendant Williams answered the Original Complaint (see Docket Entry 28) and subsequently moved to dismiss the Medical Treatment

---

5 Plaintiff appealed that decision to the United States Court of Appeals for the Fourth Circuit (see Docket Entry 12), which "dismiss[ed] the appeal for lack of jurisdiction," McAllister v. Wellpath Health Care, 827 F. App'x 355, 356 (4th Cir. 2020).

6 Although Plaintiff had named the "Forsyth County Sheriff's Department" as a defendant (see, e.g., Docket Entry 2 at 6; Docket Entry 8 at 19), the Court described the Second Amended Complaint as seeking relief from the Forsyth County Sheriff's Office (see Docket Entry 9 at 5). The undersigned later recommended that the Court treat claims against such defendant (however denominated) "as synonymous" with official-capacity Section 1983 claims against Defendants Joyner, Slater, and Kimbrough (first Text Recommendation dated Dec. 15, 2020), which recommendation the Court (per Judge Eagles) adopted (see Docket Entry 73 at 2).

Claims against her (see Docket Entry 34; see also Docket Entry 35 (supporting memorandum)). The Law Enforcement Defendants likewise moved to dismiss the COVID-19 Claims against them. (See Docket Entry 30; see also Docket Entry 31 (supporting memorandum).) After a delay in service of process (see first Text Order dated Dec. 15, 2020), Defendants Bosholm and Rhoades answered the Original Complaint and First Amended Complaint, respectively (see Docket Entries 67, 71).[7] Defendant Bosholm thereafter moved to dismiss the Medical Treatment Claims (see Docket Entry 68; see also 69 (supporting memorandum)), and Defendant Rhoades moved for judgment on the pleadings as to the same (see Docket Entry 83; see also Docket Entry 84 (supporting memorandum)). For his part, Plaintiff again moved to amend. (See Docket Entry 33; see also Docket Entry 33-1 (proposed supplemental complaint).)

The undersigned recommended that the Court deny relief to Defendants, on the grounds that the Court already had considered whether the Medical Treatment Claims and COVID-19 Claims failed to state a claim. (See Text Recommendations dated Dec. 15, 2020; second Text Recommendation dated May 12, 2021; Text Recommendation dated Sept. 16, 2021.) The Court (per Judge Eagles) adopted those recommendations. (See Docket Entries 72, 73, 87, 99.) Regarding Plaintiff's request to amend, the undersigned granted that request

---

7 Defendant Rhoades subsequently filed an amended answer. (See Docket Entry 77.)

in part, deeming the Second Amended Complaint supplemented to assert additional factual allegations in support of the COVID-19 Claims and directing the Law Enforcement Defendants to respond to those allegations. (See second Text Order dated Dec. 15, 2020 (discussing Docket Entry 33-1 (the "Supplemental Complaint")).)[8] The Law Enforcement Defendants complied, tendering an answer. (See Docket Entry 52.)

## C. The Instant Motions

Thereafter, the parties commenced discovery. (See second Text Order dated May 12, 2021 (adopting Scheduling Order).) After discovery closed, the Medical Defendants moved for summary judgment. (See Docket Entry 101; see also Docket Entry 102 (supporting memorandum).) Plaintiff responded in opposition to the Medical Defendants' Motion (see Docket Entry 113 (the "Response")), and the Medical Defendants replied (see Docket Entry 114).

On February 28, 2022, the Law Enforcement Defendants likewise moved for summary judgment. (See Docket Entry 106; see also Docket Entry 107 (supporting memorandum).) On March 2, 2022, the Clerk

---

8 During the pendency of the above-mentioned recommendations, Plaintiff moved (i) to amend (on two more occasions) (see Docket Entries 60, 86), (ii) to compel discovery (see Docket Entry 74), (iii) for default judgment (see Docket Entry 80), and (iv) for injunctive relief (see Docket Entry 92). The undersigned denied (or recommended denial of) all of those requests. (See Text Order dated Feb. 5, 2021; Text Order dated May 12, 2021; first Text Recommendation dated May 12, 2021; Text Recommendation dated Sept. 15, 2021; Text Order dated Sept. 16, 2021).) The Court (per Judge Eagles) adopted those recommendations. (See Docket Entries 87, 99.)

sent Plaintiff a letter advising him of his "right to file a 20-page response in opposition . . . within 30 days from the date of service of the [Law Enforcement Defendants' M]otion upon [him]." (Docket Entry 110 at 1 (emphasis omitted).) The letter specifically cautioned Plaintiff that a "failure to . . . file affidavits or evidence in rebuttal within the allowed time may cause the [C]ourt to conclude that the [Law Enforcement D]efendants' contentions are undisputed and/or that [Plaintiff] no longer wish[es] to pursue the matter," as well as that, "unless [Plaintiff] file[s] a response in opposition to the [Law Enforcement Defendants' M]otion, it is likely . . . judgment [will be] granted in favor of the [Law Enforcement D]efendants." (Id.)[9] Despite these warnings, Plaintiff did not respond. (See Docket Entries dated Feb. 28, 2022, to present.)[10]

---

9 Because Plaintiff filed a "Notice of Change of Address" that same day (see Docket Entry 111), the Clerk resent the above-mentioned letter to Plaintiff's updated address. Counsel for Law Enforcement Defendants likewise resent, by certified mail, the Law Enforcement Defendants' Motion (and associated exhibits) to Plaintiff at that same address. (See Docket Entry 112 at 1–3.)

10 By local rule, "[i]f a respondent fails to file a response within the time required . . ., the motion will be considered and decided as an uncontested motion, and ordinarily will be granted without further notice." M.D.N.C. LR 7.3(k). In particular, a party's failure "to respond to a summary judgment motion may leave uncontroverted those facts established by the motion," Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993). However, the Fourth Circuit requires substantive review of even unopposed motions for summary judgment. See id. ("[T]he court, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of

## II. Medical Treatment Claims

### A. Plaintiff's Allegations

According to the Original Complaint:

During a year-long period of pretrial detention at the Detention Center (see Docket Entry 2 at 7), Plaintiff received a prescription for Zyprexa, "a mental health medicine made to treat bipolar disorder and schizophrenia" (id. at 18), although Plaintiff had not received a diagnosis of either condition (see id.). Plaintiff possessed a "family history [of] diabetes" (id. at 25), placing him at higher risk for developing the same (see id. at 18), and some users of Zyprexa have attributed the onset of diabetes to the medication (see id. at 25).

Against that background, Defendant Bosholm failed to examine Plaintiff despite his "continuous complaints about [his] health issues" (id. at 11) and declined to order a blood examination or test while Plaintiff complained of diabetes symptoms including "frequent urination[,] unexplained weight loss[, and] blurry vision" (id.; see also id. at 26 (alleging glucose level exceeding 665 upon eventual testing)). Additionally, Defendant Bosholm deprived Plaintiff of "requested information about medicines prescribed" (id. at 11) and delayed for more than four months Plaintiff's access to Hepatitis C treatment (see id.). Finally, Defendant Bosholm failed to inquire about "why [Plaintiff] was

law.").

10

refusing finger sticks" (id.) and instead "took [him] off the list numerous [] time[s]" (id.) in response to Plaintiff's exercise of his right to refuse treatment (see id.).

Like Defendant Bosholm, Defendant Williams failed to treat Plaintiff as he displayed diabetes symptoms and further ignored several of his requests for emergency treatment. (See id. at 12; see also id. at 27 (alleging disregard of complaints between January 2019 and May 2019, subjecting Plaintiff "to worse health conditions" including stroke, heart disease, diabetic neuropathy, nerve damage, and eye damage).) She also declined to check Plaintiff's blood glucose, despite the fact that he had lost more than 55 pounds and experienced both frequent urination and blurred vision. (See id. at 12.)

By means of the (verified) First Amended Complaint,[11] Plaintiff has alleged that Defendant Rhoades, like Defendant Bosholm, delayed five months in addressing Plaintiff's diabetes symptoms, despite "knowledge of [Plaintiff's] repeated complaints about weight loss and frequent urination" (Docket Entry 3 at 7). (See id. at 4, 7 (noting weight loss of 55 pounds that preceded confirmatory blood

_____

11 Plaintiff attached to the First Amended Complaint (i) a document from ClassAction.org entitled "Zyprexa Linked to Diabetes" (Docket Entry 3 at 10–11), (ii) an abstract from an article entitled "Hyperglycemia and antipsychotic medications" (id. at 12), (iii) a New York Times article entitled "Lilly Settles with 18,000 over Zyprexa" (id. at 13–14), and (iv) a document from thejusticelawyer.com that provides information about Zyprexa, including its history and side effects (see id. at 15–17).

test).)  Per Plaintiff, Defendant Rhoades likewise "failed to afford [Plaintiff] physician-client rights to in[-]person thorough examinations[ as well as] requested information[] about medicines and diabetes" (id. at 4).  Finally, Plaintiff has asserted that Defendant Rhoades delayed Plaintiff's Hepatitis C treatment. (See id.; see also id. at 7 (relating that Defendant Rhoades refused to provide Hepatitis C treatment "because of the possibility of [Plaintiff] being released or shipped out before the treatment was complete").)

## B. The Record

Together with the Medical Defendants' Motion, the Medical Defendants submitted (i) certain of Plaintiff's medical records (see Docket Entries 101-1, 101-2), and (ii) an affidavit from Defendant Bosholm (see Docket Entry 101-3). The Medical Defendants also relied on an affidavit from Stephanie Popp (see Docket Entry 83-1 (the "Popp Affidavit")), originally filed in connection with Defendant Rhoades's since-denied motion for judgment on the pleadings (see Docket Entry 83). (See Docket Entry 101, ¶¶ 7, 11.)

Plaintiff did not file any exhibits in connection with the (verified) Response. (See Docket Entry 113.) However, because Plaintiff verified the First Amended Complaint under penalty of perjury (see Docket Entry 3 at 9), the Court should treat "the [factual] allegations contained therein [that] are based on personal knowledge . . . [a]s the equivalent of an opposing

12

affidavit for summary judgment purposes," <u>Williams v. Griffin</u>, 952 F.2d 820, 823 (4th Cir. 1991). In contrast, the unverified allegations of the Original Complaint (<u>see</u> Docket Entry 2 at 1-50 (reflecting no verification)) merit no such treatment. <u>See</u> <u>Williams</u>, 952 F.2d at 823 ("As a general rule, when one party files a motion for summary judgment, the non-movant cannot merely rely on matters pleaded in the complaint, but must, by factual affidavit or the like, respond to the motion.").

As relevant to the Medical Defendants' Motion, the record reflects the following:

### 1. Plaintiff's Medical Records

At the time of his intake screening at the Detention Center in January 2018, Plaintiff weighed 158 pounds and reported no significant health conditions other than post-traumatic stress disorder. (<u>See</u> Docket Entry 101-1 at 1-5.) On November 15, 2018, Dr. Cunningham prescribed Zyprexa (in 10 milligram tablet form) to treat Plaintiff's post-traumatic stress disorder and ordered follow-up blood work to occur within four to eight weeks. (<u>See</u> <u>id.</u> at 6-7, 18.) Several weeks later, Plaintiff refused laboratory services for unspecified reasons, prompting a non-party nurse to warn Plaintiff that his refusal could lead to the potential worsening of medical conditions. (<u>See</u> <u>id.</u> at 10.)

Plaintiff underwent an eye examination in January 2019, in connection with his request for glasses (<u>see</u> <u>id.</u> at 14), which

13

ultimately resulted in a referral to an outside eye doctor (see id. at 17). The non-party nurse that administered the examination noted relative weakness in Plaintiff's left eye, as well as near- and far-sightedness. (See id. at 14.)

During a follow-up visit with Dr. Cunningham on January 17, 2019, Plaintiff requested to receive an increased dose of Zyprexa (15 milligrams) at a different time of day and reported a positive response to treatment, noting improved sleep, the absence of paranoia, and easier communication with "gov[ernmen]t officials with less irritability" (id. at 18). (See id. at 18-20.) Regarding Plaintiff's refusal of laboratory services, Dr. Cunningham "[e]ducated [Plaintiff] to allow [his] blood to be drawn" (id. at 19; see also id. at 20-21 (provider notes and order documenting repeat request for "BMP and lipid panel")). Dr. Cunningham increased Plaintiff's Zyprexa dosage and planned to follow up with him within 90 days. (See id. at 20.)

On January 21, 2019, a non-party nurse saw Plaintiff in connection with his complaint of dehydration, during which encounter she recorded his weight of 187 pounds and advised him to obtain a mug from the commissary. (See id. at 24-25.) That same day, Plaintiff underwent the testing ordered by Dr. Cunningham, which revealed elevated levels of glucose (329) and triglycerides (174). (See id. at 27 (lab results identifying 65-99 as range for glucose and 0-149 as range for triglycerides).) Upon review of

14

those results the following day, Dr. Cunningham discontinued Zyprexa, switching Plaintiff to a different medication. (See id. at 28-29 (noting elevated glucose despite absence of diabetes diagnosis).) Dr. Cunningham entered an emergent referral, flagging the likely need for monitoring of Plaintiff's fasting blood sugar. (See id. at 29; see also id. at 30 (duplicate emergent referral explaining discontinuation of Zyprexa in light of elevated glucose and triglycerides); Docket Entry 101-3, ¶ 11 (Defendant Bosholm averring that "[a] potential side-effect of Zyprexa is a spike in glucose levels")). Dr. Cunningham ordered "finger stick glucoses . . . [for three] days to give the consultant data to move forward." (Docket Entry 101-1 at 31.)

Around the same time as Dr. Cunningham's orders, Plaintiff underwent a periodic health assessment with non-party nurse practitioner Katrina Davis ("NP Davis"), at which time Plaintiff still weighed 187 pounds (see id. at 33) and reported increased thirst and appetite for "junk foods" (i.e., "6 honey buns a day") (id. at 35). (See id. at 33-35.) Via a sick call dated January 25, 2019, Plaintiff sought a "diet tray" without potatoes (which "ma[de his] glucose level skyrocket" (id. at 36)) and reported the glucose levels measured by the first two finger sticks as 342 and 245 (see id.). A non-party nurse scheduled Plaintiff to see a provider (see id. at 37; see also id. at 36 (response to sick call indicating "communication given")), but the record does not reflect

15

what treatment, if any, Plaintiff received (see, e.g., id. at 39-41 (documenting "routine interventions" for visit on February 12, 2019, in connection with unspecified complaints)).

Almost a month after Dr. Cunningham discontinued Zyprexa, on February 18, 2019, Plaintiff conveyed an urgent request for medical treatment, based on his complaints of dizziness, dehydration, and loss of consciousness. (See id. at 42 (explaining that "[he] fell to the floor after blacking out").) A non-party nurse assessed Plaintiff that same day, noting the absence of signs of dehydration as well as Plaintiff's failure to seek treatment immediately after his reported fall (on the previous day). (See id. at 43-47.) She recorded his vital signs (including his weight of 175 pounds) (see id. at 45) and instructed him to obtain a mug from the commissary (see id. at 46). In response to his complaints about elevated blood sugar and lack of change to his diet, she explained that blood sugar monitoring had occurred for three days, resulting in no diagnosis of diabetes. (See id.)

About a week later, Plaintiff submitted a sick call regarding his significant weight loss over "the [preceding] 50 days to 60 days" (id. at 48 (describing change in weight from 197 pounds to 174 pounds)). During an encounter with a non-party nurse on February 28, 2019, she recorded his weight of 172 pounds (see id. at 51), which she described as "over [Plaintiff's body mass index] for [height]/[weight]" (id. at 52). In connection with that visit,

16

NP Davis ordered an A1C test[12] to check "[Plaintiff's] blood sugar levels" (Docket Entry 101-3, ¶ 18). (See Docket Entry 101-1 at 53.) Via another sick call the following day, Plaintiff reiterated his complaints about weight loss and requested double portions of food. (See id. at 55 (explaining that he experienced fainting and weakness due to weight loss).) A non-party nurse again noted that he actually qualified as overweight and denied his request for additional food. (See id. at 55-56; see also id. at 57-60 (documenting appointment on March 1, 2019).) On March 11, 2019, Plaintiff refused the A1C test ordered by NP Davis in response to his unexplained weight loss, which refusal again prompted a non-party nurse to warn Plaintiff about the potential worsening of medical conditions, which warning Plaintiff acknowledged by signing the refusal form. (See Docket Entry 101-2 at 2.)

The record does not reflect any subsequent sick calls or treatment until May 22, 2019, when NP Davis entered another order to check Plaintiff's A1C and to measure Plaintiff's weight on a weekly basis for three weeks. (See Docket Entry 101-1 at 61.) Around that same time, a non-party nurse encountered Plaintiff after he complained of dizziness and a racing heart upon standing, as well as an inability to sleep. (See id. at 64; see also id. at 62 (sick call dated May 23, 2019, in which Plaintiff described

---

12 "The A1C test is a common blood test used to diagnose type 1 and type 2 diabetes and then to gauge how well a patient is managing his diabetes." Tate v. Astrue, 853 F. Supp. 2d 937, 944 n.15 (W.D. Mo. 2012).

17

"extreme dizziness, increased pulse rate[,] and dehydration").)
She recorded his vitals (which indicated slight dehydration),
provided Plaintiff with two cups of Gatorade, and notified
unidentified mental health providers about Plaintiff's condition.
(See id. at 64–65.) Plaintiff thereafter requested Gatorade on a
daily basis to manage "[his] dehydration issue" (id. at 62 (noting
improvement after Gatorade); see also id. at 63 (duplicate request
for Gatorade)). During a subsequent encounter with a non-party
nurse on May 26, 2019, Plaintiff weighed 145 pounds and complained
of dizziness while standing, as well as his weight loss over the
preceding four months. (See id. at 66–67.) After a referral to a
"[m]id-level [p]rovider" (id. at 68), a non-party nurse entered an
order to "[d]raw labs for HIV" (id. at 69 (order reflecting
signature by NP Davis on May 28, 2019)).

NP Davis visited Plaintiff on May 29, 2019, to discuss his
unintentional weight loss and "various lab test[s] to determine
[its] cause" (id. at 70). During that visit, NP Davis noted
Plaintiff's history of elevated glucose (see id. at 71) and
explained the "importance of agreeing to lab work" (id.). She
ordered numerous additional tests (see id. at 72), the results of
which revealed an abnormal A1C (see id. at 73) and an elevated
glucose level of 668 (see id. at 81), as well as the presence of
Hepatitis C antibodies (see id.). Within a day or two of those
results, on May 31, 2019, Defendant Bosholm diagnosed Plaintiff

18

with diabetes, prescribed insulin and Metformin, and ordered that he begin a diabetic diet. (See id. at 75–80; see also Docket Entry 101-3, ¶ 26 (Defendant Bosholm averring that she discussed diagnosis and treatment plan with Plaintiff).) A repeat finger stick the following day measured an elevated glucose level of 298. (See Docket Entry 101-1 at 82.) "On June 1, 2019, [NP] Davis was made aware of Plaintiff's diabetes diagnosis." (Docket Entry 101-3, ¶ 27.)

Two days later, Defendant Bosholm responded to a sick call by Plaintiff, explaining that he possessed Hepatitis C antibodies ("and likely ha[d] the virus" (Docket Entry 101-1 at 84)), reporting his elevated glucose level of 668 (see id.), and indicating that "[Plaintiff] ha[d] diabetes" (id.). Defendant Bosholm later approved Plaintiff's request to keep a water mug in his room (see id. at 86–87), after he complained of dehydration at night (see id. at 86).

A few weeks after his diabetes diagnosis, on June 22, 2019, Plaintiff refused insulin on the grounds that "[he] ha[d] grievanced [sic] to speak to the Head Doctor/Health Care Provider [at the Detention Center]" (Docket Entry 101-2 at 4), advising that he would "not take [any] more insulant [sic] shots until further notice" (id.). Plaintiff signed a refusal form confirming his understanding that such refusal could cause death or other potential consequences. (See id.) Later that same day, he

19

consented to the finger stick but again refused insulin and signed the refusal form. (See id. at 5 (noting glucose level of 230 and listing as potential consequences worsening of medical conditions, death, and permanent disability).) The following day, Plaintiff submitted a sick call memorializing his repeated, unfulfilled "request[s] to speak with the Head Health Care providers" (Docket Entry 101-1 at 89). A non-party nurse responded, indicating that "[Plaintiff] refused [a sick call]" (id.; see also Docket Entry 101-2 at 6 (reflecting Plaintiff's refusal of sick call on June 24, 2019)). Around that same time, Plaintiff refused the finger stick as well as insulin and Metformin. (See Docket Entry 101-2 at 7–8.) That pattern continued over several days (see id. at 9–11), with Plaintiff at times consenting to finger sticks (see id. at 9 (documenting refusal of insulin despite glucose level of 198)).

On June 27, 2019, during an initial chronic care visit with Defendant Bosholm, Plaintiff explained that he "refus[ed i]nsulin because he believe[d] it [wa]s causing problems with his vision." (Docket Entry 101-1 at 91.) Defendant Bosholm observed that "[Plaintiff] previously wore glasses" (id.) and noted that, although an eye examination occurred "in Jan[uary] 2019, . . . no record [indicated] whether [Plaintiff's] eyes were dilated for [a] retina exam" (id.). She further documented his recent lab results and patterns of weight loss/gain (see id.), including his weight of 156 pounds at the time of the visit (see id. at 92), as well as his

20

"deni[al of] numbness in his feet" (id. at 91). Regarding Plaintiff's refusal of insulin, Defendant Bosholm added an oral medication, Glipizide, to Plaintiff's treatment plan (see id. at 93, 97), the focus of which centered on diet and exercise (see id. at 94). (See Docket Entry 101-3, ¶ 30.) Defendant Bosholm also ordered a number of diagnostic interventions (i.e., EKG, fasting lipid profile, A1C, urinalysis, and comprehensive metabolic panel) (see Docket Entry 101-1 at 93, 96), planned to follow up with Plaintiff in two to three months (see id. at 94), and directed medical staff to "check eyechart and provide glasses as needed" (id. at 96). According to Defendant Bosholm, she sought "to determine the cause of [Plaintiff's] vision issue while continuing to treat his diabetes." (Docket Entry 101-3, ¶ 30.) One test ordered by Defendant Bosholm indicated a glucose level of 162 as of July 5, 2019, a result much improved from earlier tests. (See id., ¶ 31; compare Docket Entry 101-1 at 98, with id. at 75 (noting glucose level of 591 on May 31, 2019), 81 (noting glucose level of 668 on May 31, 2019), and 82 (noting glucose level of 298 on June 1, 2019).)

Immediately after that visit, Plaintiff resumed his refusal of treatment, including insulin, Metformin, Glipizide, and finger sticks. (See Docket Entry 101-2 at 12-22 (documenting refusals on June 28, July 2, July 3, July 4, July 5, July 6, July 8, July 9, July 11, and July 12).) On July 12, 2019, Plaintiff submitted a

21

sick call seeking an explanation for his "remov[al] from the list of having [his] finger stuck for glucose readings and insulant [sic] shots" (Docket Entry 101-1 at 99; see also id. (characterizing such treatment as "vital elements to [his] good health and well being as a diabetic")). Two days later, the response from unidentified healthcare staff stated that finger sticks and insulin remained "ordered" (id.), memorializing Plaintiff's awareness of that circumstance (see id.). That same day, Plaintiff refused treatment. (See Docket Entry 101-2 at 23.) Given Plaintiff's resistance to treatment (see id. at 24-28), "[Defendant Bosholm] completed a Progress Note documenting Plaintiff's refusal of insulin and [finger sticks]" (Docket Entry 101-3, ¶ 32). She noted the range of his glucose levels (between 110 and 306), discontinued sliding scale insulin, and reduced the frequency of finger sticks to twice per week. (See Docket Entry 101-1 at 102 (progress note dated July 24, 2019).)

Around that same time, on July 16, 2019, Plaintiff inquired via sick call about whether "[he] had Hep[a]titis C" (id. at 100), in which communication he acknowledged receipt of information stating "that [his] liver and kidneys were okay" (id.). A response dated the following day confirmed Plaintiff's diagnosis of Hepatitis C and informed him that he would "continue to see the provider for routine follow[-]up [and] labs" (id. at 101).

22

Via a sick call dated July 26, 2019, Plaintiff expressed his desire to move off the medical dormitory, given the fact that he would "no longer tak[e] insulin" (id. at 104). (See also id. at 105 (second sick call dated July 26, 2019, charging medical staff with "deliberate indifferent treatment" for denying Plaintiff insulin shots beginning July 23, 2019), 107 (third sick call dated July 26, 2019, complaining about Plaintiff's removal from "list for finger pricks and insulant [sic] shots").) In another sick call lodged that same day, Plaintiff asked for new arms for his glasses. (See id. at 106.) The responses by healthcare staff linked the discontinuation of insulin with Plaintiff's non-compliance (see id. at 107) and noted that Plaintiff's glasses required repair after he had dropped them two weeks earlier (see id. at 106). Defendant Bosholm entered a progress note on July 26, 2019, describing Plaintiff's twice-weekly schedule for finger sticks (see id. at 108) and explaining that Plaintiff's refusals reportedly flowed from his dislike of "one of the nurses doing it" (id.). Via a response form dated July 27, 2019, a non-party nurse informed Plaintiff that "[Defendant] Bosholm [had] discontinued the sliding scale insulin related to [his] refusals" (id. at 110) but that "[he] w[ould] continue with the finger stick blood sugars twice a week [and] the oral diabetic medications" (id.).

When Plaintiff repeated his request for glasses and his desire to move back to general population during an appointment with a

23

non-party nurse on July 28, 2019, "[she] advised [him that] he ha[d] a [follow-up appointment] with [an] eye doctor" (id.). The nurse also acknowledged Plaintiff's complaints about the denial of finger sticks and insulin, explaining that his "providers" adjusted his treatment based on his refusals, which refusals he attributed to "certain staff" or sleeping during the tests. (See id.) Plaintiff also advised that "[G]lipizide irritate[d his] stomach." (See id.)

A few days later, Plaintiff submitted a sick call asking (i) to move back to general population and (ii) to stop receiving insulin, if that treatment prevented such move. (See id. at 113 (asserting that residence in medical dormitory worsened post-traumatic stress disorder).) That same day, he again refused treatment, prompting another warning about the potential consequences to his health (including worsening of medical conditions, death, and permanent disability). (See Docket Entry 101-2 at 29.) He persisted in his refusal on August 6, 2019 (see id. at 30 (refusing oral medications)), on which date a non-party nurse sent him a written communication citing "[his] medical diagnosis" (Docket Entry 101-1 at 114) as the reason for his continued residence in the medical dormitory (see id.), and on August 7, 2019 (see Docket Entry 101-2 at 31–32 (refusing oral medications, insulin, and one finger stick)). After NP Davis entered a progress note acknowledging Plaintiff's request to move

24

to general population (see Docket Entry 101-1 at 116), Defendant Bosholm again documented Plaintiff's "[f]requent[] refus[als of] medications for diabetes and [finger sticks]" (id. at 117–18). Such refusals recurred many times throughout the rest of August 2019. (See Docket Entry 101-2 at 33–70, 72–73.)

During an encounter with a non-party nurse on August 16, 2019, Plaintiff "state[d that] he ha[d] been refusing med[ication]s and finger[ ]sticks to 'prove a point' and [that] he should have already been seen by a doctor or nurse practitioner related to th[ose refusals]." (Docket Entry 101-1 at 124.) Plaintiff reiterated his request "to move off the medical floor and wonder[ed (aloud, evidently)] if[,] by refusing finger[ ]sticks and insulin, he w[ould] be able to show medical staff that he [wa]s not diabetic and d[id] not need to be housed on the medical floor." (Id.) He also "ask[ed] for more information related to diabetes and the symptoms of low and high blood sugars [and] request[ed a] diet change." (Id.) The non-party nurse counseled Plaintiff about the "importance of diabetic monitoring including compliance with checking glucose levels, sliding scale insulin as indicated, [and] lab work." (Id.) At that same appointment, Plaintiff received a pair of glasses that "fit and perform[ed] adequately." (Id.) On numerous occasions thereafter, Plaintiff refused diabetes treatment on the grounds that "[he] want[ed] to speak directly to [a] doctor before taking any further medicine in order to be officially

25

informed of any risks involved with doing so." (Docket Entry 101-2 at 52; see also id. at 48, 51, 53, 54, 56, 58, 62, 63, 65 (all documenting similar justifications for refusals).)

Amidst his many rejections of diabetes treatment, Plaintiff submitted a sick call grousing that "nothing ha[d] been done" regarding his Hepatitis C diagnosis three months earlier (see Docket Entry 101-1 at 122). In response, a non-party nurse entered a progress note (see id. at 120) and sent a written communication to Plaintiff (see id. at 121), both of which indicated that his Hepatitis C treatment "await[ed] approval" (id.). A few weeks later, when Plaintiff again inquired about Hepatitis C treatment (see id. at 137), he received confirmation of his placement "on [the] list to see [the] provider" (id.).

On August 22, 2019, Plaintiff complained of vision problems that persisted despite his receipt of new glasses. (See id. at 126.) Defendant Bosholm again memorialized Plaintiff's (i) frequent refusals of diabetes treatment, (ii) desire to move off the medical floor, and (iii) request for an eye examination. (See id. at 127.) She noted that his "[r]ecent [finger sticks] show control but are not done consistently due to his refusals." (Id. (stray punctuation omitted).) She "discontinued [insulin] after discussion with [Plaintiff during that appointment]." (Id. at 135.) Defendant Bosholm then reviewed Plaintiff's chart and confirmed that "he had a diabetic retinal eye exam showing non[-

26

]proliferative diabetic retinopathy." (Id. at 131.) Later that same day, Plaintiff requested shoes in connection with his complaint of pain in his feet and further reported soreness in his eyes. (See id. at 128–29 (indicating that "[Plaintiff] was seen by provider for requests").)

On August 23, 2019, a finger stick measured an elevated glucose level of 271. (See id. at 133 (note from non-party staff conveying result of finger stick and referral to Defendant Bosholm); see also id. at 132 (sick call from Plaintiff complaining about discontinuation of insulin and decreased frequency of finger sticks).) That same day, Defendant Bosholm responded by renewing Plaintiff's insulin (see id. at 135–36), after which renewal Plaintiff immediately returned to his practice of refusing treatment (see, e.g., Docket Entry 101-2 at 67 (documenting refusal of insulin on August 24, 2019)). His refusals of diabetes treatment continued throughout September 2019. (See id. at 74–76, 78–81.)

Consistent with that trend, Plaintiff initially refused his chronic care follow-up visit in September 2019. (See id. at 77; Docket Entry 101-1 at 138.) When Defendant Bosholm encountered Plaintiff during the rescheduled appointment on October 11, 2019, he continued to complain of vision problems ("now that his diabetes [wa]s better controlled" (Docket Entry 101-1 at 140)) and repeated his request for Hepatitis C treatment (see id.). (See id. at

27

139-45.)  The record does not reflect any subsequent treatment, but his refusals of insulin and finger sticks continued throughout the rest of October 2019.  (See Docket Entry 101-2 at 82-88.)

On February 5, 2020,[13] Plaintiff submitted a sick call advising about his recent weight loss (14 pounds in the preceding two-and-a-half weeks) and requesting skinless chicken as an alternative to the turkey on the diabetic trays.  (See Docket Entry 101-1 at 38.) In response, Defendant Williams noted Plaintiff's weight of 186 pounds and denied his request based on the lack of medical justification to change his diet at that time.  (See id.)

---

13 Although Defendant Bosholm apparently credited the date of Defendant William's signature, February 5, **2019** (see Docket Entry 100-3, ¶ 14), both Plaintiff and unidentified "triaging staff" dated the form February 5, **2020** (see Docket Entry 101-1 at 38). Given that Plaintiff received his diabetes diagnosis in May 2019 and the record does not otherwise suggest that he received a diabetic diet before that diagnosis (i.e., in February 2019), the Court should adopt the latter view.  In any event, the resolution of Medical Defendants' Motion does not depend on the timing of the foregoing sick call.

2. Medical Grievance and Responses[14]

On June 4, 2019, Plaintiff submitted a grievance (the "Medical Grievance") regarding his "displeas[ure] with [his] health status." (Docket Entry 2 at 39.) According to the Medical Grievance, after Plaintiff began taking Zyprexa in December 2018 to treat post-traumatic stress disorder, he experienced an elevated blood glucose level and developed symptoms of diabetes (i.e., dizziness and dehydration). (See id. at 39-40 (denying that onset of diabetes predated arrival at Detention Center).) Those symptoms continued when Plaintiff stopped taking Zyprexa in January 2019. (See id. at 40 (describing weight loss from 197 pounds to 167 pounds).) After he lost an additional 25 pounds, he eventually received a medical housing assignment and diabetes treatment. (See id.) Plaintiff blamed Zyprexa (and, by extension, Dr. Cunningham) for causing the development of diabetes. (See id.)

In the "Step I" response, Defendant Williams observed that "[a]ll medications have side effects" and disclaimed the ability to conclusively determine that Zyprexa caused Plaintiff's diabetes.

---

14 Plaintiff attached to the Original Complaint (i) a one-page response from Defendant Joyner regarding one of Plaintiff's grievances (see Docket Entry 2 at 38), (ii) a partially illegible, two-page inmate grievance form (see id. at 39, 41), with a legible, handwritten single-page document interspersed between those pages (see id. at 40), (iii) an unsigned, undated handwritten note regarding Plaintiff's prognosis (see id. at 42), and (vi) several pages of unsigned, undated handwritten notes (apparently authored by Plaintiff) complaining about his medical treatment (see id. at 43-47). Absent any objection by Defendants, the undersigned treats the foregoing documents as part of Plaintiff's grievance.

(See id. at 39.)[15]  Via the "Step II" response, Captain Warren characterized the Medical Grievance as relating to Wellpath, not the Forsyth County Sheriff's Office.  (See id. at 41.)  Plaintiff refused to accept that response and demanded that the Medical Grievance proceed to the "next level" (id.).  In the "Step III" response, Defendant Slater expressed an inability to "positively say" that Zyprexa caused Plaintiff's diabetes and noted that Plaintiff had chosen to take the prescribed medication.  (See id.) Plaintiff again declined to accept that response, maintaining his position that Zyprexa triggered his diabetes and that Dr. Cunningham wrongly prescribed that medication (given Plaintiff's family history of diabetes).  (See id.)  In response to "[Plaintiff's] appeal for final remedy" (id. at 38), "[Defendant Joyner] encouraged [Plaintiff] to continue to work with the medical provider to aid them in treating [his] medical issues" (id.).

An unsigned, undated note accompanying the Medical Grievance advises that Plaintiff may not need insulin for his whole life. (See id. at 42 ("Your blood sugar may decrease in the long term.").)  According to the first page of the handwritten notes apparently authored by Plaintiff (some of which may constitute a continuation of Plaintiff's refusals to accept a response to the Medical Grievance):  Plaintiff weighed 197 pounds before he began "tak[ing] Zyprexa]" (id. at 43), and he lost 30 pounds within a

---

15  The rest of Defendant Williams's response appears illegible.  (See id.)

30

month of beginning that regimen (see id.). "[W]hen [Plaintiff] asked the [d]octor [about] the side effects . . . [,] he stated that [there] was a 14 [percent] chance/risk of getting diabetes amongst other side effects." (Id.) Plaintiff then stopped taking Zyprexa and lost more than 20 pounds. (See id.) Zyprexa thus "triggered diabetic conditions" (id.), which Plaintiff did not have when he came to the Detention Center (see id.).[16]

Per the narrative on the four pages of subsequent handwritten notes: Plaintiff reported a 30-pound weight loss in January 2019, as well as "dehydration, extreme thirst, frequent urination, extreme hunger, blurred vision[,] and weakness" (id. at 44). Unidentified "staff medical members" ignored (or mocked) those complaints and told Plaintiff "that [his body mass index] was accurate and that [he] could afford to lose more weight" (id.). When Plaintiff finally received a blood test in May 2019 (by which time Plaintiff had lost almost 30 more pounds), the test revealed a glucose level exceeding 665 as well as the presence of Hepatitis C antibodies. (See id.) However, Plaintiff received no Hepatitis C treatment, leading him to follow up about a month later, when an unidentified staff member discouraged Plaintiff from writing grievances about Hepatitis C. (See id. ("[W]e don't treat Hep C.").) After another month passed, Plaintiff learned that

_____

16 The text on the first page appears to continue beyond the margins of that document. (See id.)

unidentified medical staff awaited "approval for [Hepatitis C] treatment" (id. at 44–45).

In connection with his diabetes treatment, Plaintiff relocated from general population "to the medical floor" (id. at 44), where he received "diet trays" (id.), underwent finger sticks three times per day (see id.), and took oral mediation two times per day (see id.). Unidentified medical staff removed him from "the insulin list" (id. at 45), despite his elevated glucose levels "of more than 275" (id.; see also id. at 47 (describing incident on September 8, 2019, when he did not receive oral insulin)). "[M]ultiple medical staff members" (id. at 45) ignored his continual requests for in-person examinations and information about diabetes (see id.) and further failed to inform him about the risks of taking (or not taking) his medications (see id.). As a result, such individuals "subjected [Plaintiff] to many other harmful health conditions ranging from seizures, to strokes, to heart disease, to charcot foot, to [d]iabetic ne[u]ropathy (nerve damage), to [d]iabetic [r]etinopathy (eye problems), to [d]iabetic nephropathy (kidney damage) and ketosis." (Id.)

Finally, as concerns "the most recent request . . . denied [by unidentified staff members]" (id.), Plaintiff received no examination by a charge nurse, only a directive to "put in a sick call" (id. at 46) in response to his complaints of blurred vision and swollen, painful, bloodshot eyes (see id. at 45–46). "Dr.

32

Branch" had told Plaintiff to obtain another eye examination if his initial one occurred while his glucose level exceeded 150. (See id. at 46.) However, "a nurse" denied Plaintiff a new examination, deeming his glasses sufficient "if [Plaintiff] can see out of [them,] even if the prescription caused [his] eyes to be very sore" (id.; see id. (describing response to sick call advising about eye examination in one year)). As a result, Plaintiff faced the choice of wearing glasses that caused him to "experience extreme pain" (id.) or to forgo "[his] glasses and not be able to see at all" (id.).

### 3. Popp Affidavit

Stephanie Popp, "a duly authorized representative of Wellpath LLC with full knowledge of the services [Defendant] Rhoades[] provided as an independent contractor for Wellpath LLC" (Docket Entry 83-1, ¶ 2) averred that Defendant Rhoades stopped providing medical services for inmates at the Detention Center in April 2018 (id., ¶¶ 4-5).

### III. COVID-19 Claims

### A. Plaintiff's Allegations

According to the (verified) Second Amended Complaint:

After the COVID-19 pandemic began in March 2020, officers at the Detention Center did not wear masks, thereby exposing Plaintiff to COVID-19. (See Docket Entry 8 at 15.) Detention Center policy prevented Plaintiff from having a face covering, and Defendant

33

Joyner's subordinates punished Plaintiff for using a face covering. (See id.; see also id. at 17, 23 (alleging that subordinates of Defendant Kimbrough took away Plaintiff's face covering and required him to "lock down").) Defendant Slater failed to inform Plaintiff about the presence of COVID-19 at the Detention Center (see id. at 17) and denied Plaintiff the ability to protect himself (like by wearing a face covering) (see id. at 17–18). Additionally, Defendant Slater did not (i) ensure that his subordinates wore masks (see id.) or (ii) provide Plaintiff with "any type of virus testing" (id. at 18). Defendant Kimbrough similarly (i) enabled the policy of denying a face covering to Plaintiff, (ii) failed to ensure that staff at the Detention Center practiced social distancing and wore masks, and (iii) forced Plaintiff to share personal space with other inmates on a daily basis. (See id. at 22.) Defendants Kimbrough also declined to implement COVID-19 testing for detainees, when at least five employees tested positive for COVID-19 between March 2020 and June 2020. (See id. at 23; accord id. at 19 (lodging similar accusation against Defendant Forsyth County Sheriff's Office).)

Via the (verified) Supplemental Complaint, Plaintiff has alleged the following:

Defendants Joyner, Slater, and Kimbrough did not isolate detainees with COVID-19 from the rest of the general population (see Docket Entry 33-1 at 5, 6, 8) or ensure that staff at the

34

Detention Center followed "the 14[-]day standard quar[a]ntine guideline" (id. at 5; see id. at 6, 8). More specifically, in August 2020, "Wellpath medical staff . . . clear[ed] an inmate" (id. at 18) infected with COVID-19 to move into a general population dormitory, where that inmate shared kiosk machines and telephones with other detainees (see id. at 13, 14, 15, 16 (repeating allegation against all Law Enforcement Defendants)). The following day, that detainee (along with his cellmate) relocated to a quarantine dormitory, but the cellmate returned to general population within the next 10 days (i.e., without completing a 14-day quarantine). (See id. at 13–17.) Staff failed to monitor that inmate's condition while in quarantine (see id. at 15, 17) and Plaintiff did not receive a COVID-19 test following that incident (see id. at 13–17).

## B. The Record

In connection with the Law Enforcement Defendants' Motion, the Law Enforcement Defendants tendered a copy of an interim guidance document from the Centers for Disease Control and Prevention ("CDC") (see Docket Entry 106-1 (the "CDC Guidance")), as well as (i) an affidavit from Captain Warren (see Docket Entry 108), (ii) numerous exhibits accompanying that affidavit (see Docket Entries 108-1 through 108-28), and (iii) an affidavit from non-party Joshua R. Swift, the Health Director for the Forsyth County Department of Public Health (see Docket Entry 109). Plaintiff

35

failed to respond (see Docket Entries dated Feb. 28, 2022, to present), but because he verified the Second Amended Complaint and Supplemental Complaint under penalty of perjury (see Docket Entry 8 at 29; Docket Entry 33-1 at 21), the Court should treat "the [factual] allegations contained therein [that] are based on personal knowledge . . . [a]s the equivalent of an opposing affidavit for summary judgment purposes," Williams, 952 F.2d at 823.

As relevant to the Law Enforcement Defendants' Motion, the record reflects the following:

On March 13, 2020, after a series of declarations by the World Health Organization, the CDC, and the State of North Carolina, Defendant Kimbrough issued a press release (see Docket Entry 108-7) and Captain Warren circulated a memorandum (see Docket Entry 108-8), both of which announced the precautions that the Detention Center would take to protect against the spread of COVID-19. (See Docket Entry 108, ¶ 7.) In particular, the Detention Center suspended all public visitation (except for attorney visits), discontinued all inmate programs, and began screening both staff and new arrestees for fever and signs of respiratory distress. (See Docket Entry 108-7 at 1; see also Docket Entry 108-8 at 1–2 (describing screening procedure); Docket Entries 108-5, 108-6 (screening questions).) According to the memorandum, staff denied entry to the Detention Center as a result of that screening should

36

"go see their primary care doctor" (Docket Entry 108-8 at 1),
whereas new intakes exhibiting "a temperature of 100 degrees
Fahrenheit or higher" may receive a recommended housing assignment
of "the negative pressure room" or a single-person cell (see id. at
2; see also Docket Entry 108, ¶ 7 (defining "negative pressure
room" as "room with lower pressure on the inside so that if a door
is opened, air cannot escape")). Around that time, the Detention
Center also shared with inmates educational information about how
to protect themselves from COVID-19. (See Docket Entry 108, ¶ 7
(citing Docket Entry 108-9 (fact sheets)).)

    In the days that followed, the Detention Center first extended
the time during which medical staff observed new intakes and,
effective April 2, 2020, imposed a 14-day quarantine period for
those individuals. (See id., ¶ 8 (citing Docket Entries 108-10 and
108-11).) The Detention Center also designated housing units for
new intakes (see id. (citing Docket Entry 108-10)), which units the
Detention Center converted to single cells (see id. (citing Docket
Entries 108-11 and 108-12)). To promote social distancing, the
Detention Center (i) restricted the number of inmates allowed out
of their cells to shower or use the telephones (see id. (citing
Docket Entry 108-11)), and (ii) cancelled daily meetings in the
muster room, where staff previously received their work assignments
(see id. (citing Docket Entry 108-12)).

37

In an effort to limit in-person contact and practice social distancing, the Detention Center accommodated the remote scheduling of state criminal proceedings, such as plea and bond modification hearings. (See id., ¶ 13 (citing Docket Entries 108-23 and 108-24).) On April 7, 2020, Captain Warren circulated a memorandum explaining that federal criminal hearings likewise would occur remotely at the Detention Center. (See Docket Entry 108-25.) The Detention Center also suspended "weekenders" during that time. (See Docket Entry 108, ¶ 13 ("A 'weekender' is a person ordered to serve an active prison sentence where they are allowed to serve such time in increments, on the weekends.").)

On April 13, 2020, the Detention Center began requiring jail staff (i) to wear personal protective equipment (including an N95 mask) when escorting new intakes with COVID-19 to the negative pressure room, (ii) to sanitize the area around such intakes, and (iii) to dispose of used personal protective equipment as biohazard waste. (See id., ¶ 9 (citing Docket Entry 108-13).) Shortly thereafter, the Detention Center increased sanitation efforts by placing hand sanitizer throughout the facility, as well as by ordering additional cleaning supplies and protective equipment. (See id., ¶ 10 (citing Docket Entry 108-14).) On April 22, 2020, the Detention Center expanded the N95 mask mandate to include jail staff, inmate workers, medical staff, and contract workers assigned to new intake housing units. (See id., ¶ 11 (citing Docket Entry

38

108-15).) "[O]n April 28, 2020, the [Detention Center] required all jail staff, medical staff, inmate workers, and contractors to wear surgical masks throughout the entire facility when interacting with inmates." (Id. (citing Docket Entry 108-16).) Around that time, the Detention Center issued two cloth masks to each inmate and instructed them on proper use. (See id.)

On May 21, 2020, the Detention Center designated cells for new intakes who required medical housing and isolated such inmates from general population. (See id., ¶ 12 (citing Docket Entry 108-18).) The Detention Center also obligated inmates to wear masks while traveling to outside medical appointments (which the Detention Center tried to limit based on necessity) and required all inmates to wash their hands upon their return from such appointments. (See id. (citing Docket Entries 108-18 and 108-19).) For inmates who either visited the emergency room or needed hospitalization, the Detention Center imposed a 14-day quarantine upon their return. (See Docket Entry 108-18 at 1.)

On June 12, 2020, the Detention Center documented its first confirmed cases of COVID-19, when five staff members tested positive. (See Docket Entry 108, ¶¶ 5, 14 (citing Docket Entry 108-1 (press release)).) That same day, Defendant Slater distributed a memorandum to all staff and inmates, reporting those positive test results and explaining that all inmates had received surgical masks, use of which medical staff recommended for two

39

weeks. (See Docket Entry 108-20 at 1.) That memorandum categorized "the risk to inmates/residents" as "low" in light of the mask mandate at the Detention Center, noting that no inmates had tested positive for the virus to that point. (See id.) Around that time, "medical staff began testing new intakes who exhibited signs of COVID-19." (Docket Entry 108, ¶ 15.)

On June 14, 2020, Plaintiff filed a grievance (the "COVID-19 Grievance") regarding a non-party detention officer who failed to wear a mask while in close contact with inmates in Plaintiff's dormitory (for a period of ten minutes in the early morning hours of that same day). (See Docket Entry 108-28 at 1.) Via the COVID-19 Grievance, Plaintiff noted the higher risk COVID-19 posed to his health, given his status as a diabetic. (See id.) Plaintiff demanded that the Detention Center (i) remove the offending officer from "a population position" and (ii) provide Plaintiff with a COVID-19 test. (See id.) The "Step I" response indicates that the officer received a directive to wear his mask inside the Detention Center. (See id.) After Plaintiff refused to accept that response, the "Step II" response reiterated the mandatory nature of the mask policy and the officer's awareness of that fact. (See id. at 2.) Plaintiff again indicated his disagreement, expressing his belief that the mask mandate "should be more of a policy rather than a memo[randum] to staff members" (id.). Via the "Step III" response, Defendant Slater distinguished a temporary change in

40

procedure pursuant to a memorandum from a permanent policy change. (See id.)  Plaintiff declined to accept that response, maintaining that "[Defendant] Kimbrough should enforce a mandatory mask policy for all staff and visitors in the [Detention Center]."  (Id.)

On June 24, 2020, the Detention Center announced (via press release) that the Forsyth County Department of Public Health would test all residents of the Detention Center and detention officers beginning the following day.  (See Docket Entry 108-21 at 1.)  The mass testing event occurred over the three subsequent weekdays, during which approximately 900 inmates and detention staff received COVID-19 tests.  (See Docket Entry 109, ¶ 4.)  The Detention Center required all staff to submit to testing (see Docket Entry 108-22 at 1), and any inmate who refused testing instead underwent a 14-day quarantine (see Docket Entry 108, ¶ 15).  The mass testing event yielded four positive results from detention staff and no positive results from inmates.  (See Docket Entry 109, ¶ 4.)  No inmates tested positive for COVID-19 until July 6, 2020, when one individual tested positive upon intake.  (See id., ¶ 5.)

## DISCUSSION

### I.  Relevant Legal Standards

### A. Summary Judgment

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

41

P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Additionally, "[a]s to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. The movant bears the burden of establishing the absence of such dispute. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). In other words, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him.'" Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (brackets in original) (quoting Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979)). If, applying this standard, the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists and summary judgment is improper." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996).

42

"However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment." Lewis v. Eagleton, No. 4:08CV2800, 2010 WL 755636, at *5 (D.S.C. Feb. 26, 2010) (unpublished) (citing Barber v. Hospital Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992)), aff'd, 404 F. App'x 740 (4th Cir. 2010); see also Pronin v. Johnson, 628 F. App'x 160, 161 (4th Cir. 2015) (explaining that "[m]ere conclusory allegations and bare denials" or the nonmoving party's "self-serving allegations unsupported by any corroborating evidence" cannot defeat summary judgment). In response to a summary judgment motion, "the nonmoving party [must] go beyond the pleadings and[,] by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex Corp., 477 U.S. at 324 (internal quotation marks omitted). Factual allegations in a complaint or court filing constitute evidence for summary judgment purposes only if sworn or otherwise made under penalty of perjury. See Reeves v. Hubbard, No. 1:08CV721, 2011 WL 4499099, at *5 n.14 (M.D.N.C. Sept. 27, 2011) (unpublished), recommendation adopted, slip op. (M.D.N.C. Nov. 21, 2011).

**B. Section 1983**

"A state official can be in a [Section] 1983 suit in three ways: in his personal capacity, his official capacity, or in a more

43

limited way, his supervisory capacity." King v. Rubenstein, 825
F.3d 206, 223 (4th Cir. 2016).

### 1. Individual Liability

"Under [Section] 1983, a state actor may be liable if he
'subjects, or causes to be subjected' an individual 'to the
deprivation of any rights, privileges, or immunities secured by the
Constitution.' As a general matter, a [state actor] may incur
[individual Section] 1983 liability only through affirmative
misconduct." Randall v. Prince George's Cnty., 302 F.3d 188, 202
(4th Cir. 2002) (quoting Parratt v. Taylor, 451 U.S. 527, 535–36
(1981)). "[Section] 1983 must be 'read against the background of
tort liability that makes a man responsible for the natural
consequences of his actions.'" Vinnedge v. Gibbs, 550 F.2d 926,
928 (4th Cir. 1977) (quoting Monroe v. Pape, 365 U.S. 167, 187
(1961)). Accordingly, "it must be 'affirmatively shown that the
official charged acted personally in the deprivation of the
plaintiff's rights.'" Wright v. Collins, 766 F.2d 841, 850 (4th
Cir. 1985) (quoting Vinnedge, 550 F.2d at 928).

### 2. Official Liability

With respect to Section 1983 official-capacity claims, "a
municipality cannot be held liable *solely* because it employs a
tortfeasor — or, in other words, a municipality cannot be held
liable under [Section] 1983 on a *respondeat superior* theory."
Monell v. Department of Soc. Servs., 436 U.S. 658, 691 (1978).

"Only in cases where the municipality causes the deprivation 'through an official policy or custom' will liability attach." Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (quoting Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999)). "Because [S]ection 1983 was not designed to impose municipal liability under the doctrine of respondeat superior, the 'official policy' requirement was 'intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby to make clear that municipal liability is limited to action for which the municipality is actually responsible.'" Riddick v. School Bd. of Portsmouth, 238 F.3d 518, 523 (4th Cir. 2000) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 479 (1986)). "To state a cause of action against a municipality, a [S]ection 1983 plaintiff must plead (1) the existence of an official policy or custom; (2) that the policy or custom is fairly attributable to the municipality; and (3) that the policy or custom proximately caused the deprivation of a constitutional right." Pettiford v. City of Greensboro, 556 F. Supp. 2d 512, 530 (M.D.N.C. 2008).

3. Supervisory Liability

Under Fourth Circuit authority,

a supervisor can be liable [under Section 1983] where (1) he knew that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury; (2) his response showed deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) [] there was an affirmative causal link between his inaction and the constitutional injury.

45

King, 825 F.3d at 224 (internal quotation marks omitted). A plaintiff ordinarily cannot satisfy that second prong "by pointing to a single incident or isolated incidents, for a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence within the area of his responsibilities." Slakan v. Porter, 737 F.2d 368, 373 (4th Cir. 1984) (internal citation omitted). However, "[a] supervisor's continued inaction in the face of documented widespread abuses . . . provides an independent basis for finding he either was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates." Id.

## C. Deliberate Indifference

Turning to the constitutional deprivation alleged here,

when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs — e.g., food, clothing, shelter, medical care, and reasonable safety — it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 200 (1989) (emphasis added). Courts evaluate pretrial detainees' conditions of confinement in state custody under the Due Process Clause of the Fourteenth Amendment. See Bell v. Wolfish, 441 U.S. 520, 535 (1979). "The due process rights of a pretrial detainee are at least as great as the [E]ighth [A]mendment protections available to the convicted prisoner . . . ." Martin v. Gentile,

46

849 F.2d 863, 870 (4th Cir. 1988). "Thus, deliberate indifference to the serious medical needs of a pretrial detainee violates the [D]ue [P]rocess [C]lause." Young v. City of Mount Ranier, 238 F.3d 567, 575 (4th Cir. 2001).

"[E]ven though [a pretrial detainee's deliberate-indifference] claim arises under the Fourteenth Amendment, [courts] have traditionally looked to Eighth Amendment precedents in considering a Fourteenth Amendment claim of deliberate indifference to serious medical needs." Mays v. Sprinkle, 992 F.3d 295, 300 (4th Cir. 2021). The Eighth Amendment obligates prison officials to "provide humane conditions of confinement," which includes, among other things, "ensur[ing] that inmates receive adequate . . . medical care," Farmer v. Brennan, 511 U.S. 825, 832–33 (1994). Courts have viewed that requirement as applicable to a pretrial detainee's deliberate-indifference claim grounded in the risks posed by the COVID-19 pandemic. See, e.g., Broggin v. BRRJA, No. 7:21CV180, 2022 WL 875040, at *5 (W.D. Va. Mar. 23, 2022) (unpublished) ("evaluat[ing detainee's] claim of deliberate indifference to the serious risks posed by COVID-19 under the same standard as a prisoner's claim of inadequate care under the Eighth Amendment" (internal quotation marks omitted)).

To make out such a constitutional claim, a plaintiff must show that a defendant "acted with 'deliberate indifference' (subjective) to [the plaintiff's] 'serious medical needs' (objective)." Iko v.

47

Shreve, 535 F.3d 225, 241 (4th Cir. 2008). A medical need qualifies as serious if it "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id. (internal quotation marks omitted). A defendant displays deliberate indifference when he possesses knowledge of the risk of harm to an inmate and knows that "his actions were insufficient to mitigate the risk of harm to the inmate arising from his medical needs." Id. (emphasis and internal quotation marks omitted); see also Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) ("To prove deliberate indifference, plaintiffs must show that 'the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety.'" (brackets in original) (quoting Farmer, 511 U.S. at 837)).

"The subjective component . . . sets a particularly high bar to recovery." Iko, 535 F.3d at 241. In particular, "deliberate indifference entails something more than mere negligence, . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer, 511 U.S. at 835. "It requires that a [defendant] actually know of and disregard an objectively serious condition, medical need, or risk of harm." De'lonta v. Johnson, 708 F.3d 520, 525 (4th Cir. 2013) (internal quotation marks omitted). "Failure to respond to an inmate's known medical needs raises an inference

48

[of] deliberate indifference to those needs." Miltier v. Beorn, 896 F.2d 848, 853 (4th Cir. 1990), overruled in part on other grounds by Farmer, 511 U.S. at 837. However, neither "[n]egligence [n]or malpractice in the provision of medical services . . . constitute[s] a claim under [Section] 1983." Wright, 766 F.2d at 849; see also Harris v. Poole, No. 1:18CV378, 2020 WL 531954, at *14 (M.D.N.C. Feb. 3, 2020) (unpublished) ("[D]isagreements between an inmate and medical provider regarding the inmate's medical care, without more, do not create a constitutional claim, and inmates possess no constitutional right to treatment by a particular type of medical provider."), recommendation adopted, slip op. (M.D.N.C. Mar. 30, 2020).

Finally, "a significant delay in the treatment of a serious medical condition may, in the proper circumstances," constitute deliberate indifference. Webb v. Hamidullah, 281 F. App'x 159, 166 (4th Cir. 2008). "A[ constitutional] violation only occurs, however, if the delay results in some substantial harm to the patient." Id. at 166-67 (internal footnote omitted); see also Sharpe v. South Carolina Dep't of Corr., 621 F. App'x 732, 734 (4th Cir. 2015) ("A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." (internal quotation marks omitted)).

49

## II. Analysis

### A. Medical Treatment Claims

The Medical Defendants have argued that Plaintiff lacks "sufficient proof of [their] deliberate indifference to [his] medical condition." (Docket Entry 102 at 24.) In response, Plaintiff has insisted that the Medical Treatment Claims should proceed, arguing that "the many sick calls and grievances [] which [] Plaintiff presented to the [] Court at the beginning stages of this civil action" (Docket Entry 113 at 2) demonstrate that the Medical Defendants knew about the risks to his health (see id.; see also id. at 6 (suggesting that Plaintiff repeatedly "complained about frequent urination, dizziness, dehydration, chest pains, foot pains, leg bruises, numbness and tingling, blurry and deterio[r]ating vision")). According to Plaintiff, the Medical Defendants "never followed up on" (id. at 6) the foregoing complaints or "the high blood glucose readings" (id.) that preceded his diabetes diagnosis by five months (see id.). (See also id. at 11 (suggesting that "[Medical D]efendants repeatedly denied [ P]laintiff an examination").) Plaintiff has emphasized the seriousness of his diabetes diagnosis (see id. at 4, 11–12), explaining that he has experienced "blurry vision, [continually increasing] insulin dependency . . . , feet pains, high glucose levels, and extreme chest pains" (id. at 5). Moreover, Plaintiff has stated that, to treat his diabetes, the Medical Defendants

50

prescribed large amounts of insulin without determining the appropriate level for him and thus rendered him insulin-dependent. (See id. at 7 (criticizing Medical Defendants for "fail[ing] to perform any sort of triage"), 10 (same), 12-13 (contending that prescription of increasing amounts of liquid insulin violated standard of care for Type 2 diabetes).) Plaintiff also has resisted the conclusion that he merely disagreed with the Medical Defendants about the proper course of treatment. (See id. at 6-7.)

For the reasons explained below, the Court should enter judgment for the Medical Defendants.

1. Defendant Bosholm

The Medical Defendants have staked Defendant Bosholm's entitlement to summary judgment on the grounds that (i) Plaintiff received appropriate care leading up to his diabetes diagnosis (during which time he refused blood work on multiple occasions) (see Docket Entry 102 at 15-17), (ii) Defendant Bosholm then provided various types of treatment for Plaintiff's diabetes, despite his repeated refusals of finger sticks and insulin (see id. at 17-20), and (iii) Plaintiff did not require treatment for Hepatitis C in light of the monitoring of his kidney and liver functions (see id. at 20-22). In contrast, Plaintiff has asserted that Defendant Bosholm ignored Plaintiff's significant unexplained weight loss, "an alarming trigger for any medical practicer [sic]" (Docket Entry 113 at 6). Plaintiff also has complained about

51

(i) his referral to "the Wellpath nurses" (id. at 8) in connection with his weight-loss concerns and (ii) the denial of his corresponding requests for additional food (see id.). Plaintiff has maintained that Defendant Bosholm declined to take any action in response to those concerns, instead advising Plaintiff "that [his body mass index] was normal" (id.).

The Court should conclude that no reasonable fact-finder would discern deliberate indifference from Defendant Bosholm's role in events surrounding Plaintiff's diabetes diagnosis, diabetes treatment, and Hepatitis C treatment.

a. Diabetes Diagnosis

Plaintiff's medical records from between November 15, 2018, when Dr. Cunningham prescribed Zyprexa, and May 30, 2019, when NP Davis obtained the results of the A1C test, reflect no appointments with or treatment from Defendant Bosholm. (See Docket Entry 101-1 at 1–74; see also id. at 75–76 (documenting diabetes diagnosis by Defendant Bosholm on May 31, 2019).) Such records square with some allegations of the Original Complaint, which states that Plaintiff conveyed various health complaints for four to five months before Defendant Bosholm ever examined Plaintiff. (See Docket Entry 2 at 11.) However, Plaintiff also has suggested that the supposed neglect by Defendant Bosholm deprived him of "blood examination[s] or test[s]" for that same period (see id.), which allegation the record conclusively rebuts. (Compare Docket Entry 101-1 at 6 (Dr.

52

Cunningham ordering tests in November 2018), 53 (NP Davis ordering A1C test in February 2019), with Docket Entry 101-2 at 1 (Plaintiff refusing laboratory services in December 2018), 2 (Plaintiff refusing A1C test in March 2019)).[17]

Critically, Plaintiff has neither disputed the fact that he refused blood tests in the months preceding his diabetes diagnosis nor established that the ensuing delay in diagnosis "result[ed] in some substantial harm to [him]," Webb, 281 F. App'x at 166-67. (See Docket Entry 113 at 1-13.) Via the Original Complaint, Plaintiff implied that he refused treatment on at least some occasions. (See Docket Entry 2 at 26 (alleging that "[Plaintiff] ha[s] a right to refuse treatment").) Even absent that acknowledgment, Plaintiff's signature appears at the bottom of a "Refusal of Treatment" form dated March 11, 2019 (compare Docket Entry 101-2 at 2, with Docket Entry 2 at 50 (Plaintiff's signature certifying Original Complaint)), by which signature he confirmed his understanding of the laboratory services he refused as well as the risks involved in such refusal. (See Docket Entry 101-2 at 2

---

17 Insofar as Plaintiff has argued that Defendant Bosholm displayed deliberate indifference toward his significant, unexplained weight loss leading up to his diabetes diagnosis (see Docket Entry 113 at 6), the uncontested facts reflect that NP Davis and non-party nurses (not Defendant Bosholm) responded to Plaintiff's complaints on that topic (see Docket Entry 101-1 at 48-53, 55-61, 66-72). The record offers no support for the conclusion that Defendant Bosholm knew about Plaintiff's weight loss before May 2019, much less that she withheld appropriate treatment. Her undisputed lack of personal involvement in that aspect of Plaintiff's treatment should doom any Medical Treatment Claim grounded in Plaintiff's weight loss.

53

("I acknowledge that I have been fully informed of and understand the above refused treatment and the risks involved in refusing. I hereby release and agree to hold harmless [Correct Care Solutions] and correctional personnel from all responsibility and any ill effects which may result from this refusal. I have read this form and certify that I understand its contents.").)

Defendant Bosholm has explained that Plaintiff's refusals in December 2018 and March 2019 interfered with the ability of Dr. Cunningham and NP Davis to "evaluate Plaintiff's health" (Docket Entry 101-3, ¶ 7) and "glucose levels" (id., ¶ 20), respectively. Fortunately for Plaintiff, those providers persisted in their efforts (see Docket Entry 101-1 at 21 (Dr. Cunningham ordering repeat tests in January 2019, after Plaintiff's refusal), 61 (NP Davis ordering repeat A1C test in May 2019, after Plaintiff's refusal)), and both eventually obtained information about conditions that required (and received) immediate attention (see id. at 27-32 (Dr. Cunningham discontinuing Zyprexa and ordering blood sugar monitoring in response to Plaintiff's elevated glucose level), 73-76 (Defendant Bosholm diagnosing diabetes based on results of repeat A1C test ordered by NP Davis)). Under the circumstances (i.e., the uncontested fact that Plaintiff twice hindered efforts to evaluate his condition), the Court should conclude that no reasonable fact-finder could deem any failure by

54

Defendant Bosholm to detect Plaintiff's diabetes before May 2019 to
rise to the level of deliberate indifference.

        b. Diabetes Treatment

The Court should reach the same result regarding whether a
reasonable fact-finder could decide that Defendant Bosholm
displayed deliberate indifference toward Plaintiff's need for
diabetes treatment between June and October 2019.  The undisputed
record reflects that, on the same day she diagnosed Plaintiff with
diabetes, Defendant Bosholm prescribed medications as well as a
diabetic diet (see id. at 75–80) and, in response to his complaint
of dehydration, allowed him to keep a water pitcher in his cell
(see Docket Entry 103-1, ¶ 28).  Shortly after Plaintiff began to
refuse insulin and other treatment, Defendant Bosholm ordered a
different oral medication to help manage his condition.  (See id.,
¶¶ 29–30.)  When Plaintiff persisted in his refusals, Defendant
Bosholm reduced the frequency of his finger sticks (see id.,
¶¶ 32–33) but continued to treat his condition with oral medication
(see Docket Entry 101-1 at 102).  In August 2019, Defendant Bosholm
discontinued Plaintiff's insulin regimen (see id. at 126–27, 135),
but she renewed it almost immediately when he complained about the
denial of insulin (see id. at 132–36), whereupon he continued to
refuse insulin (see Docket Entry 101-2 at 67, 69, 72–76, 78–82,
84–88).  In all, between June and October 2019, Plaintiff refused
diabetes treatment on more than 80 occasions.  (See id. at 4, 5, 7,

8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 72, 73, 74, 75, 76, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88.)

Without disputing that such refusals occurred, Plaintiff nonetheless has suggested that Defendant Bosholm evinced deliberate indifference. (See, e.g., Docket Entry 2 at 19-20 (alleging that Plaintiff's removal from finger stick and insulin list "punish[ed him] for exercising [his] right to refuse treatment at any time").) However, courts repeatedly have rejected deliberate-indifference claims stemming from refusals of treatment, based on the principle that such refusals merely reflect non-actionable disagreements with medical providers. See Oliver v. Daniels, No. 5:16-CT-3101, 2019 WL 4858847, at *12 (E.D.N.C. Sept. 30, 2019) (unpublished) (disposing of deliberate-indifference claim at summary judgment when the plaintiff "declined various treatments for pain, failed to attend scheduled medical appointments, disregarded medical orders as to physical activities, and engaged in vigorous physical exercises all while complaining of severe pain"), appeal dismissed, 2019 WL 8405461 (4th Cir. Oct. 31, 2019) (unpublished); Medrano Ortiz v. Solomon, No. 5:15-CT-3251, 2019 WL 1245779, at *6 (E.D.N.C. Mar. 18, 2019) (unpublished) ("Where the record demonstrates [the] defendants closely monitored [the] plaintiff's

56

conditions and attempted to provide medical care, but [the] plaintiff refused, he cannot establish an Eighth Amendment violation."), aff'd, 778 F. App'x 236 (4th Cir. 2019); Kelly v. United States, Civ. Action No. 1:15-4914, 2016 WL 8711519, at *16 (S.D.W. Va. Jan. 15, 2016) (unpublished) ("The record . . . reveals that [the p]laintiff refused to abide by dietary restrictions and take over-the-counter acid reflux as directed."), recommendation adopted, 2016 WL 1060846 (S.D.W. Va. Mar. 17, 2016) (unpublished). Accordingly, Plaintiff's documented refusals of diabetes treatment cannot establish deliberate indifference to his need for the same, especially given that Defendant Bosholm attempted to treat his condition despite his pattern of (and shifting bases for) non-compliance.[18]

c. Hepatitis C Treatment

Finally, the Court should note the lack of evidence demonstrating deliberate indifference by Defendant Bosholm with respect to Plaintiff's Hepatitis C treatment. The undisputed record establishes that, although one test detected Hepatitis C

_____

18 As already discussed, the record reflects that Plaintiff may have refused diabetes treatment because he (A) believed that insulin caused vision problems, (B) disliked one of the nurses administering the finger sticks and/or medication, (C) slept through treatment, (D) understood that his need for insulin would prevent his desired move away from the medical floor, (E) wished to "prove a point" (i.e., that he did not need insulin), (F) wanted to show that his condition warranted intervention by a different provider or different means, or (G) desired unspecified additional information about the risks of treatment. None of those justifications suggest that Defendant Bosholm evinced deliberate indifference toward Plaintiff's serious medical need.

57

antibodies in Plaintiff's blood, other testing confirmed normal liver and kidney functions. (See Docket Entry 101-3, ¶¶ 55, 57; see also id., ¶ 56 (characterizing Hepatitis C as slow-acting liver infection that causes serious consequences in minority of individuals with antibodies).) Because Defendant Bosholm detected no signs or symptoms of Hepatitis C in her examination of Plaintiff in October 2019 (see id., ¶ 60), she identified no need for further treatment at that time (see id., ¶ 61). Importantly, Plaintiff possesses a constitutional right to treatment based only on "medical necessity and not simply that which may be considered merely desirable." Bowring v. Godwin, 551 F.2d 44, 47-48 (4th Cir. 1977); see also Thomas v. Commonwealth, No. 7:04CV497, 2005 WL 1074333, at *4 (W.D. Va. May 5, 2005) (unpublished) ("Simply because [a] plaintiff disagrees with the course of treatment prescribed by his doctors does not mean that any of his rights have been violated."), recommendation adopted, slip op. (W.D. Va. May 25, 2005). Courts have discerned no deliberate indifference based on the denial of Hepatitis C treatment to an asymptomatic patient. See, e.g., Coward v. Clarke, No. 7:20CV702, 2022 WL 991702, at *4, 8-9 (W.D. Va. Mar. 31, 2022) (unpublished); Hinton v. McCabe, No. 3:16CV222, 2018 WL 1542238, at *5 (E.D. Va. Mar. 29, 2018) (unpublished), appeal dismissed, 735 F. App'x 84 (4th Cir. 2018). The Court should adopt that reasoning here.

58

2. Defendants Williams and Rhoades

According to the Medical Defendants, the role of Defendant Williams as the Director of Nursing precluded her involvement in "hands-on medical treatment [of] inmates" (Docket Entry 102 at 23).[19]  As concerns Defendant Rhoades, the Medical Defendants have sought judgment in his favor "because he was not employed as a medical provider at [the Detention Center] at the time of Plaintiff's allegations."  (Id. (citing Docket Entry 101-3, ¶ 62 and Docket Entry 83-1).)  For his part, Plaintiff has argued that Defendant Williams, like Defendant Bosholm, disregarded his complaints about unintentional weight loss.  (See Docket Entry 113 at 8.)  Additionally, Plaintiff has asserted that Defendant Williams awaited approval from Defendant Rhoades before proceeding with treatment for Plaintiff's Hepatitis C.  (See id. at 3 (suggesting that "official documents" confirm status of Defendant Rhoades as Wellpath employee in May 2019).)

The Court should award judgment to Defendants Williams and Rhoades because the record lacks evidence that either treated Plaintiff at the pertinent time and/or in connection with a complaint of constitutional significance.

_____

19 The Medical Defendants further argued that, insofar as Plaintiff attempted to inculpate Defendant Williams for her demeanor or apparent disbelief of his complaints, those allegations, even if true, do not rise to the level of a constitutional violation.  (See id. at 24.)  Because such allegations lie outside the scope of the Medical Treatment Claims that survived the screening stage (see Docket Entry 5 at 11–12; Docket Entry 9 at 5), the Court need not address them.

59

As a preliminary matter, neither Defendant Williams nor Defendant Rhoades can bear individual Section 1983 liability for the conduct of other Wellpath employees (including subordinates). See Wright, 766 F.2d at 850 ("In order for an individual to be liable under [Section] 1983, it must be 'affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights.'" (quoting Vinnedge, 550 F.2d at 928)). Assuming that Plaintiff intended to assert a theory of supervisory liability (see Docket Entry 2 at 5 (identifying Defendant Williams as "Director of Nursing"); Docket Entry 3 at 1 (identifying Defendant Rhoades as "the [r]egional [d]octor who controls most of the decisions and actions taken by Wellpath in th[e Detention Center]"); see also id. at 4 (characterizing Defendant Rhoades as "the [r]egional [c]ommand [that] should have responded to [Plaintiff's] many complaints")), such allegations (or, in the case of Defendant Rhoades, averments) fall far short of the required showing for supervisory liability under Section 1983. See Slakan, 737 F.2d at 373 (characterizing "burden of proof in supervisory liability cases" as "heavy"); see also id. (explaining that a plaintiff must "demonstrate that the prisoners face a pervasive and unreasonable risk of harm from some specified source" and "show that the supervisor's corrective inaction amounts to deliberate indifference or tacit authorization of the offensive practices" (internal quotation marks and brackets omitted)).

60

Regarding Defendant Williams's participation in events underlying the Medical Treatment Claims, the Court should assume that she (i) declined to examine Plaintiff in person, despite knowledge of his repeated complaints (see Docket Entry 2 at 27), (ii) denied Plaintiff's request for skinless chicken as an alternative to "the turkey . . . served on diabetic trays" (Docket Entry 101-1 at 38), and (iii) took no further action in response to Plaintiff's weight loss, after repeatedly telling him "that [his body mass index] was normal" (Docket Entry 113 at 8). Although a failure to examine could, as a general matter, lend support to a deliberate-indifference claim, the record establishes that several other medical providers examined Plaintiff on numerous occasions (see, e.g., Docket Entry 101-1 at 18–20 (Dr. Cunningham), 33–35 (NP Davis), 70–71 (NP Davis), 75–76 (Defendant Bosholm), 91–95 (Defendant Bosholm), 126–27 (Defendant Bosholm), 139–45 (Defendant Bosholm)), and Plaintiff has not explained why Defendant Williams bore an independent responsibility to do so (see Docket Entry 2 at 27; Docket Entry 113 at 8). Importantly, Plaintiff "possess[es] no constitutional right to treatment by a particular type of medical provider." Harris, 2020 WL 531954, at *14.

As far as the refusal by Defendant Williams to accommodate Plaintiff's requested diet change, the Court should view that denial as lacking constitutional significance under the circumstances. See Majid v. Richards, C/A No. 0:19-1793, 2020 WL

61

6136731, at *4 (D.S.C. Sept. 25, 2020) (unpublished) ("[The plaintiff] does not have a constitutional claim . . . merely because he disagrees with the prescribed diet he received."), recommendation adopted, 2020 WL 6136301 (D.S.C. Oct. 19, 2020) (unpublished), appeal dismissed, 850 F. App'x 847 (4th Cir. 2021). With respect to the communications from Defendant Williams regarding Plaintiff's body mass index, Plaintiff has neither challenged the accuracy of those communications nor indicated how such communications exposed him to any harm. (See Docket Entry 113 at 8.)  Regarding allegations that Defendant Williams displayed deliberate indifference by failing to address Plaintiff's "catastrophic weight loss" (id.), the record demonstrates that other providers who treated Plaintiff (primarily NP Davis) ordered tests and monitored his condition (see Docket Entry 101-1 at 53 (ordering A1C test), 61 (ordering weekly weight checks and repeat A1C test after Plaintiff's refusal of initial test), 69 (ordering "labs for HIV")).  In sum, the Court should grant Defendant Williams summary judgment based on the limited role she played in the events underlying the Medical Treatment Claims.

Turning to the individual liability of Defendant Rhoades, the Court should conclude that the Medical Treatment Claims against him lack merit for a similar reason.  Aside from Plaintiff's somewhat vague (though sworn) statements about the failure by Defendant Rhoades to examine him and treat his medical conditions (see Docket

62

Entry 3 at 4, 7), nothing in the record reveals <u>any</u> involvement by Defendant Rhoades in Plaintiff's care (<u>see</u> Docket Entry 101-1 at 1–145; <u>accord</u> Docket Entry 8 at 5 ("From 2018 January to 2020 April, I never seen [sic] [Defendant] Rhoades[,] the [l]ead [m]edical practioner [sic].")). Although that circumstance theoretically could support a deliberate-indifference claim, Stephanie Popp averred that Defendant Rhoades possessed no connection to Wellpath after April 2018 (<u>see</u> Docket Entry 83-1, ¶ 5), several months before the first events giving rise to the Medical Treatment Claims (<u>see</u> Docket Entry 2 at 7 (identifying October 2018 as earliest date of "events giving rise to [Plaintiff's] claim")). To the extent Plaintiff has relied on his "submi[ssion] to the Court at the initial stage of this suit [that Defendant] Rhoades was a[n] employee of Wellpath at the time of the diagnoses of diabetes and Hep[atitis ]C around May 29, 2019" (Docket Entry 113 at 3), the First Amended Complaint nowhere specifies any dates of employment for Defendant Rhoades (let alone any basis for Plaintiff's personal knowledge of such matters) (<u>see</u> Docket Entry 3 at 1–17). Accordingly, the assertions of the First Amended Complaint do not directly contradict the Popp Affidavit, as it relates to when Defendant Rhoades ceased providing medical services for inmates at the Detention Center.

Insofar as Plaintiff has invoked "official documents" that supposedly link Defendant Rhoades to the delay that Plaintiff

63

experienced while awaiting treatment for Hepatitis C (see Docket Entry 113 at 3-4), that vague reference cannot satisfy Plaintiff's obligation to "designate specific facts showing that there is a genuine issue for trial," Celotex Corp., 477 U.S. at 324 (emphasis added and internal quotation marks omitted); see also Hensley ex rel. N.C. v. Price, 876 F.3d 573, 580 n.5 (4th Cir. 2017) ("[C]ourts are not like pigs, hunting for truffles buried in briefs. . . . [I]t is not [the Court's] job to wade through the record and make arguments for either party." (internal quotation marks omitted)). Assuming that Plaintiff intended to cite the Supplement (Docket Entry 4), which the undersigned struck as an unauthorized, procedurally improper amendment to the First Amended Complaint (see Text Order dated May 6, 2020), Plaintiff has failed to acknowledge the stricken status of that document (see Docket Entry 113 at 3-4). Even ignoring that circumstance, a brief review of the Supplement yields no support for the notion that Defendant Rhoades influenced the decision to treat (or delay treatment of) Plaintiff's Hepatitis C. (See Docket Entry 4 at 1-70.) Therefore, because the record reflects no personal involvement by Defendant Rhoades in Plaintiff's treatment at the relevant time, the Medical Treatment Claims against him fail as a matter of law.

## B. COVID-19 Claims

The Law Enforcement Defendants have sought summary judgment on the grounds that they responded reasonably (i.e., without

64

deliberate indifference) to the risks posed by the COVID-19 pandemic (see Docket Entry 107 at 7-16 (highlighting how the Detention Center implemented CDC Guidance with respect to sanitation and education, operations, screening procedures, quarantining and social distancing, personal protective equipment, and testing)). Alternatively, the Law Enforcement Defendants have contended that, if constitutional violations occurred, qualified immunity shields them from liability. (See id. at 16-19 (citing Tate v. Arkansas Dep't of Corr., No. 4:20CV558, 2020 WL 7378805 (E.D. Ark. Nov. 9, 2020) (unpublished), recommendation adopted, 2020 WL 7367864 (D. Ark. Dec. 15, 2020) (unpublished), and Reinhardt v. Hogan, Civ. Action No. 20-1011, 2021 WL 82894 (D. Md. Jan. 11, 2021) (unpublished).) As already mentioned, Plaintiff did not respond to those arguments. (See Docket Entries dated Feb. 28, 2022, to present.)

Applying a liberal construction to the Second Amended Complaint and Supplemental Complaint, Plaintiff has challenged the following aspects of the Detention Center's COVID-19 response: (i) use of face coverings, (ii) quarantine procedures, (iii) testing for inmates and staff, (iv) social distancing, and (v) information regarding the presence of COVID-19 at the Detention Center. As far as specific incidents underlying the COVID-19 Claims, Plaintiff has complained that the Law Enforcement Defendants (or their subordinates) (i) punished him, on one

65

occasion, for using (and/or deprived him of) a face covering, and (ii) on another occasion, allowed an inmate infected with COVID-19 to reside in general population for one day (thereby potentially exposing his cellmate and other inmates, including Plaintiff, to COVID-19), without requiring the cellmate to undergo a 14-day quarantine or affording Plaintiff a COVID-19 test.[20]

For the reasons explained below, the Court should deem the averments of the Second Amended Complaint and Supplemental Complaint insufficient to allow a reasonable fact-finder to attribute deliberate indifference to Defendants Joyner, Slater, and Kimbrough in their individual or supervisory capacities. The Court should likewise conclude that any official-capacity component of the COVID-19 Claims fails as a matter of law.

---

[20] Although Plaintiff also averred that Defendants Slater and Kimbrough authorized the housing of new intakes in the medical dormitory (see Docket Entry 8 at 22 ("[Defendant Kimbrough] allowed new intakes who were not yet cleared of [COVID-19] to be housed in the medical dorm[itory] that [Plaintiff] was in."); Docket Entry 33-1 at 6 ("[Defendant Slater] also allowed new intakes to be housed immediately in the 2A medical dorm[itory] where most inmates had underlying health conditions.")), the record indicates that, (i) as of April 2020, the Detention Center housed new intakes in 4C and 4D (see Docket Entry 108-11 at 1), (ii) as of May 2020, the Detention Center housed new intakes who required medical housing in 2B (see Docket Entry 108-18 at 1), and (iii) as of June 2020, Plaintiff resided in 4B (see Docket Entry 108-28 at 1). Plaintiff declined to contest the sworn statement by Captain Warren regarding the Detention Center's policy of "quarantining new intakes" (Docket Entry 108, ¶ 8; see also id., ¶ 12) in locations other than the medical dormitory (2A) or where Plaintiff resided (4B). As noted at the screening stage, "Plaintiff cannot raise any claim on behalf of other inmates who may have been harmed." (Docket Entry 5 at 12.)

66

1. Defendant Joyner

Plaintiff has not averred as to direct, affirmative involvement by Defendant Joyner in above-described deprivations, such that Defendant Joyner can bear no individual liability under Section 1983. (See Docket Entry 8 at 16 (mentioning, in conclusory fashion, failure by Defendant Joyner "in the area of supervising/supervision, training of officers and control/enforcement of conducts [sic] of his subordinates"); Docket Entry 33-1 at 5 (criticizing Defendant Joyner as "similar to his colleagues" for neglecting to enforce mask mandate and quarantine, as well as for failing to order COVID-19 retesting for inmates), 13 (inculpating Defendant Joyner as "similar to his administrative colleagues" in failing to enforce mask mandate or isolate inmates infected with COVID-19).) Even assuming that Defendant Joyner's subordinates fell short of constitutional standards in their approach to face coverings or quarantining and testing inmates, the generalized accusations against Defendant Joyner on those topics suggest no "continued inaction in the face of documented widespread abuses," Slakan, 737 F.2d at 373, for purposes of establishing his supervisory liability. Moreover, contrary to Plaintiff's uncorroborated statement that "[he] wrote many grievances to [Defendant Joyner] in [sic] concerns to officers not wearing mask [sic]" (Docket Entry 33-1 at 13 (emphasis added)), the record reflects a single grievance addressing the lone instance when a

67

non-party detention officer violated the Detention Center's mask mandate (see Docket Entry 108-28 at 1). Accordingly, the Court should enter judgment for Defendant Joyner.

### 2. Defendant Slater

Without identifying direct, affirmative involvement in specific instances of misconduct, Plaintiff has suggested that Defendant Slater violated Plaintiff's constitutional rights in many of the same ways as Defendant Joyner, with regard to the Detention Center's mask mandate and policies for testing and quarantining inmates. (See Docket Entry 8 at 17 ("[Defendant Slater] did nothing to allow [Plaintiff] to practice more preventive methods . . . ."), 18 ("[Defendant Slater] did not enforce the need for officers to wear the face[]covering . . . ."); Docket Entry 33-1 at 6, 14 (grousing about violation of mask mandate, non-compliance with quarantine guidelines, and lack of retesting for inmates).)[21] Plaintiff also has criticized Defendant Slater for neglecting to tell him about the presence of COVID-19 at the Detention Center. (See Docket Entry 8 at 17 ("[Defendant Slater] did nothing to inform [Plaintiff] of the virus being in th[e

_____

21 Plaintiff tacitly acknowledged the lack of direct involvement by Defendant Slater by characterizing him as "similar to his administrative colleagues" (Docket Entry 33-1 at 14) and by maintaining that his role as a supervisor confers "direct[] and personal[] responsib[ility for] . . . the officers who are on the scene inflicting injurious acts" (Docket Entry 8 at 18). The Fourth Circuit recognizes a type of supervisory liability under Section 1983, but, as already discussed, Plaintiff cannot satisfy his heavy burden of showing such liability by means of conclusory statements about isolated incidents.

68

Detention Center] . . . .").)  However, the record reflects that
Defendant Slater distributed a general memorandum to "[a]ll [s]taff
and [i]nmates" (Docket Entry 108-20 at 1) on the same day that five
staff members tested positive for COVID-19 (see Docket Entry 108,
¶ 14), advising inmates about "some confirmed cases of COVID-19 in
staff members that work in the [Detention Center]" (Docket Entry
108-20 at 1) and encouraging inmates to wear the surgical masks
provided by medical staff (see id.).  The Detention Center also
separately provided information about how inmates could protect
themselves from COVID-19.  (See, e.g., Docket Entry 108-9.)

Because Plaintiff failed to respond to the Law Enforcement
Defendants' Motion, those facts remain uncontested.  See Custer v.
Pan Am. Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993).  For the
reasons discussed in connection with the COVID-19 Claims against
Defendant Joyner, the Court should deem the averments as to
Defendant Slater similarly insufficient to create a jury question
on individual or supervisory liability.

### 3. Defendant Kimbrough

Plaintiff has charged Defendant Kimbrough with responsibility
for the allegedly deficient Detention Center policies in the areas
of social distancing (see Docket Entry 8 at 22), face coverings
(see id. at 22–23; Docket Entry 33-1 at 16), testing (see Docket
Entry 33-1 at 16), and quarantining (Docket 8 at 22–23; Docket
Entry 33-1 at 8, 16).  However, those contentions stop short of

69

directly accusing Defendant Kimbrough of any specific, affirmative acts of wrongdoing (see, e.g., Docket Entry 8 at 23-24 (attempting to inculpate Defendant Kimbrough to same degree as "lower ranks who are on the scene inflicting injurious acts" based on his "superior authority with power to change th[o]se harms")), and any theory of supervisory liability should fail for the reasons already explained. As a result, the Court should grant summary judgment for Defendant Kimbrough in his individual and supervisory capacities.[22]

### 4. Defendant Forsyth County Sheriff's Office

Although the undersigned previously recommended that "the official[-]capacity claims . . . proceed at th[e] preliminary stage" (Text Recommendation dated Dec. 15, 2020), which recommendation the Court (per Judge Eagles) adopted (see Docket Entry 73 at 2), the record as now developed reflects the absence of a material factual dispute about whether Defendants Joyner, Slater, and Kimbrough violated Plaintiff's constitutional rights. Therefore, the official-capacity claim against them should fail as a matter of law. Waybright v. Frederick Cnty., 528 F.3d 199, 203 (4th Cir. 2008) ("[M]unicipalities cannot be liable under [Section]

---

22 Given that proposed resolution, the Court need not reach qualified immunity as an alternative basis for granting judgment for Defendants Joyner, Slater, and Kimbrough. See Brooks v. Johnson, 924 F.3d 104, 119 n.6 (4th Cir. 2019) ("recogniz[ing] the 'special problem' raised when the objective qualified immunity standard is applied to an Eighth Amendment violation that requires wrongful intent in the form of 'deliberate indifference'" (quoting Rish v. Johnson, 131 F.3d 1092, 1098 n.6 (4th Cir. 1997))).

1983 without some predicate constitutional injury at the hands of the individual [state] officer, at least in suits for damages." (internal quotation marks omitted)).[23]

<u>**CONCLUSION**</u>

Because the record lacks evidence from which a reasonable fact-finder could conclude that Defendants exhibited deliberate indifference to Plaintiff's serious medical needs, Defendants have established their entitlement to judgment as a matter of law.

**IT IS THEREFORE RECOMMENDED** that the Medical Defendants' Motion (Docket Entry 101) and the Law Enforcement Defendants' Motion (Docket Entry 106) be **GRANTED**.

/s/ L. Patrick Auld<br>
**L. Patrick Auld**<br>
**United States Magistrate Judge**

August 22, 2022

---

23 Even if the Court independently considered whether a jury question exists as to official-capacity liability, the record (as previously detailed) conclusively rebuts the notion that, in the area of COVID-19-related health and safety, the Detention Center "lack[ed] guidelines and policies" (Docket Entry 8 at 20).